## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Amber Leigh Perry,                                     **Civil No. 13-cv-795 (PJS/SER)**

       Plaintiff,

v.                                                     **REPORT AND RECOMMENDATION**

Carolyn Colvin,
Commissioner of Social Security,

       Defendant.

---

      Neut L. Strandemo, Esq., Strandemo Sheridan & Dulas, PA, 1380 Corporate Center Curve, Suite 320, Eagan, Minnesota 55121, for Plaintiff.

      Ann M. Bildtsen, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge.

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Amber Leigh Perry ("Perry") seeks review of the Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits ("DIB") and for supplemental security income ("SSI"). *See* (Compl.) [Doc. No. 1]; (Admin. R.) [Doc. No. 7 at 122–32]. The parties filed cross-motions for summary judgment ("Perry's Mot. for Summary J." and "Commissioner's Mot. for Summary J.," respectively) [Doc. Nos. 8, 11] that have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and District of Minnesota Local Rule 72.1. For the reasons below, the Court recommends that Perry's Motion for Summary Judgment be denied and the Commissioner's Motion for Summary Judgment be granted.

I.      **BACKGROUND**

   A.      **Procedural History**

Perry protectively filed her applications for DIB and SSI in July 2009, alleging a disability onset date ("AOD") of May 20, 2009.[1]   (Admin. R.) [Doc. No. 7 at 57, 122–32]. Perry's applications were denied initially on November 6, 2009, and upon reconsideration on January 29, 2010.  (*Id.* at 56–79).  Following Perry's request, Administrative Law Judge Larry Meuwissen (the "ALJ") heard the matter.  (*Id.* at 33–56).  The ALJ issued an unfavorable decision, finding Perry did not meet the statutory requirements for being disabled.  (*Id.* at 12–32).  The Appeals Council denied review, rendering the ALJ's decision final.  (*Id.* at 1–5).

   B.      **Plaintiff's Background and Testimony**

Perry testified to the following facts at the hearing before the ALJ.  At the AOD, Perry was twenty-eight years old.  *See* (*id.* at 26, 38).  Previously Perry worked as a waitress, cashier, and a nurse assistant.  (*Id.* at 26).  Perry has three children.[2]  (*Id.* at 39).  In discussing her history of substance abuse problems, Perry stated "[i]n my past when I was a teenager I had used a lot of different types of drugs.  Otherwise I've—drank, I'm more of a binge drinker and I—I drink here and there and I've quit a few times[.]"  (*Id.* at 40).

---

[1]      Protective filing is a written or oral statement that clearly establishes intent to file for Social Security Benefits.  The effect of a protective filing is to preserve the date of application. For example, if a hypothetical claimant sends a letter postmarked to Social Security Administration on February 1 explaining she intends to file next month, February 1 becomes her filing date, even if she sends her application on March 27.  Program Operations Manual System ("POMS"), GN 00204.010C.5a–e. (SSA, Aug. 6, 2013).   There is no special format for a protective filing, as long as it clearly expresses intent to file, although oral statements of intent to file for Title II benefits must be documented and signed by a Social Security Association employee.  POMS, GN 00204.010B.1 – GN 00204.010B.4. (SSA, Aug. 6, 2013), *available at* https://secure.ssa.gov/apps10/poms.nsf/ lnx/0200204010.
[2]      At the hearing, Perry also described situations involving her children that are not relevant to her claims in this case and are not discussed.  *See* (Admin. R. at 39, 45–46).

Perry planned to start treatment, but could not get herself to go in front of a group by herself; she sought treatment because she wanted support and did not want to drink anymore. (*Id.* at 40–41).  Perry decided to wait for her husband to be released from jail so they could go to treatment together.  (*Id.* at 41).  Perry had not consumed alcohol during the previous month or so, but before that she was drinking daily for about three months.  (*Id.*).

Perry attempted to complete a nursing program starting in 2006, but she did not pass her classes.  (*Id.* at 41–42).  Perry usually drove a few times a week, did some shopping, cooked, and cleaned—although she could not clean for more than ten to fifteen minutes before sitting down, and she did her own laundry.  (*Id.* at 42–43).  Perry's neck and shoulder pain at times affected her limbs, and the pain kept her from working.  (*Id.* at 43).   At least twice a day Perry laid down to relax because of her muscle pain.  (*Id.*).  Perry further explained that "[she] tense[d] up [her] arms and legs sometimes [she could not] move [her] arms and legs they're so asleep that they're really painful or [she felt] muscle spasms or shocking pains."  (*Id.* at 50).  In addition, Perry's neck hurt from driving to the hearing without lying down and her arms felt heavy.  (*Id.*).  Perry had been looking for employment for a while, but she thought she was undependable, unable to perform work properly, and was not as physically strong as she used to be.  (*Id.* at 46–47).

 Perry saw Dr. H.J. Osekowsky ("Dr. Osekowsky") every one to three months and saw a therapist once every week or two.[3]  (*Id.* at 43–44).  Since age twelve, Perry experienced back

---

[3]     At the hearing, Perry testified that she had been seeing a therapist sporadically for ten years named Jean Felstead.  (Admin. R. at 43).  The ALJ explained that he did not have a record of those visits.  (*Id.* at 44).  The Court's review of the Administrative Record did not uncover any notes from Jean Felstead and the notes were not included in the Appeals Council's list of additional evidence submitted after the ALJ's decision.  (*Id.* at 4).  Moreover, Perry does not advance any argument to the Court about her treatment with Jean Felstead.  *See* (Perry's Mem. in Supp. at 3) (citing Perry's testimony about her treatment with Jean Felstead, but not relying on it for her argument); (Perry's Resp.).  Therefore, Perry's relationship with Jean Felstead does not impact the Court's decision and is merely noted for the sake of completeness.

problems and she had neck surgery that helped with her pain temporarily.  (*Id.* at 45).  She believed she may need more surgeries as she always felt neck pain.  (*Id.* at 43-44, 50).

Perry detailed several traumas she experienced including her assault in 2007 and car accident in 2008.  (*Id.* at 47–48).  Perry was diagnosed as bipolar necessitating mood management.  (*Id.* at 48).  Nevertheless, she could generally see what was irrational.  (*Id.*).  Perry explained she had trouble getting along with people since her assault and could not maintain friendships.  (*Id.* at 48, 50).  Perry only left her house when necessary because it caused her too much stress.  (*Id.* at 49).  She did, however, go out with her children.  (*Id.*).  Perry tried to fulfill her obligations, but sometimes was unable to because of a "bad day" or pain.  (*Id.*).  Perry also had a troubled past that included sexual abuse.  *See, e.g.*, (*id.* at 385).

### C.      Relevant Medical Record Evidence

Certain medical records submitted as part of the Administrative Record concern impairments and or illnesses which neither party nor the ALJ based their analysis on—such medical records will not be summarized.

#### 1.      Before May 20, 2009

Perry's relevant medical records relate to a jaw injury stemming from an assault in 2007, a neck/spine injury stemming from an automobile accident in 2008, and mental conditions.  The Court discusses the relevant medical records sequentially by injury.

#### a.      Jaw injury

Perry was assaulted in November 2007, by an individual she believed to be her ex-boyfriend; the assault caused multiple fractures to her jaw.  *See, e.g.*, (*id.* at 482).  After her assault, Perry had jaw surgery also in November 2007.  *See* (*id.* at 479, 485–86, 489, 494).  In January 2008, Dr. Abraham J. Sorom ("Dr. Sorom") saw Perry for a follow-up and noted Perry's

jaw was healing nicely.  (*Id.* at 494).  She did not suffer persistent discomfort in her jaw.  (*Id.*).

Dr. Sorom also noted that Perry had been in a car accident, discussed below, and requested pain

medications to treat her resultant spinal fracture; Dr. Sorom advised Perry to contact

neurosurgical services for the pain medication.  (*Id.*).   On March 20, 2008, Perry saw Dr. Sorom

complaining of what she believed to be exposed mandibular hardware.[4]  (*Id.* at 489).   Dr. Sorom

scheduled Perry for surgery to remove the plate in her jaw.  (*Id.*).   On March 31, 2008, Perry saw

Dr. Sorom for a post-surgery follow-up.[5]  (*Id.* at 488).   Perry complained of some numbness in

the chin and the place where the plate was removed, but stated that jaw pain did not bother her

particularly.  (*Id.*).   Dr. Sorom opined that Perry was doing well and could return to full use of

her mouth.  (*Id.*).   When Perry followed up with Dr. Sorom on June 5, 2008, she thought she felt

the plates through her gingiva and could hear a clicking sound, but experienced only occasional

jaw pain.[6]  (*Id.* at 487).   Dr. Sorom recommended that the plates be left, and noticed Perry had

healed nicely.  (*Id.*).

Perry followed up with Dr. Patrick Munson ("Dr. Munson") in November 2008, again

complaining of her ability to feel the plates, some clicking of the jaw, and wondering if the plates

need to be removed for denture implantation.  (*Id.* at 486).   Dr. Munson said the plates did not

need to be removed, but could be removed.  (*Id.*).   In January 2009, Perry returned to see Dr.

Munson about plate removal.  (*Id.* at 485).   Perry complained of increased swelling and pain over

---

[4]      Mandibular refers to the "U-shaped bone (in superior view), forming the lower jaw, articulating by its upturned extremities with the temporal bone on either side."  *Stedman's Medical Dictionary*, Mandible (27th ed. 2000).

[5]      No medical record of the actual removal of mandibular hardware was in the Administrative Record; however, given Dr. Sorom's other treatment notes the Court recognizes the surgery did occur.

[6]      Gingiva refers to "[t]he dense fibrous tissue and overlying mucous membrane, which envelop the [tooth sockets] of the upper and lower jaws and surrounds the necks of the teeth." *Stedman's Medical Dictionary*, Alveolus, Gingiva (27th ed. 2000).

the last week.  (*Id.*).  Dr. Munson expressed his reservations about performing any operative interventions while Perry smoked.  (*Id.*).

On February 13, 2009, Perry presented to Dr. Amy DeJong ("Dr. DeJong") with jaw pain.  (*Id.* at 457–58).  Dr. DeJong prescribed Perry a narcotic to last until she should be seen by a specialist.  (*Id.*).

## b.  Neck/ Spine Injury

In January 2008, Perry was involved in an automobile accident that resulted in her being taken to the hospital.  *See, e.g.*, (*id.* at 499, 501).  Perry was under the influence of alcohol at the time.  (*Id.* at 500).  Perry complained of "significant left upper extremity pain, extending from the cervical spine to the shoulder and to the lateral upper left arm [, and m]inor pain sensation in the left forearm and radial fingers[, and] some . . . headaches."[7]  (*Id.* at 499).  A computed tomography ("CT") scan showed that she had a C6 and C7 fracture.[8]  (*Id.* at 499, 501).  Multiple other tests were performed including a magnetic resonance imaging scan ("MRI").[9]  (*Id.* at 495–96, 501–08).  At a follow-up about a month after the accident, Perry was improving and Dr.

---

[7]     Cervical means "relating to a neck . . . in any sense." *Stedman's Medical Dictionary*, Cervical (27th ed. 2000).
        Radial means "[r]elating to the radius (bone of the forearm), to any structures named from it, or to the radial or lateral aspect of the upper limb as compared to the ulnar or medial aspect." *Stedman's Medical Dictionary*, Radial (27th ed. 2000).
[8]     A CT scan refers to the "imaging anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane." *Stedman's Medical Dictionary*, Tomography, Computed Tomography (CT) (27th ed. 2000).
[9]     An MRI is "a diagnostic radiologic modality, using nuclear magnetic resonance technology, in which the magnetic nuclei (especially protons) of a patient are aligned in a strong, uniform magnetic field, absorb energy from tuned radiofrequency pulses, and emit radiofrequency signals as their excitation decays. These signals, which vary in intensity according to nuclear abundance and molecular chemical environment, are converted into sets of tomographic images by using field gradients in the magnetic field, which permits 3-dimensional localization of the point sources of the signals." *Stedman's Medical Dictionary*, Imaging, Magnetic Resonance Imaging (27th ed. 2000).

Todd Patrick ("Dr. Patrick") advised her to wean off her cervical-thoracic orthosis; Perry still complained of neck pain and was given Oxycontin after stating she did not receive the Percocet prescription that had been mailed.[10] (*Id.* at 491–92).

On February 20, 2008, Perry saw Dr. Santhi Subramaniam ("Dr. Subramaniam"), complained of continued pain and discomfort, and sought pain medications as she stated she had not received the medications in the mail. (*Id.* at 480–81). Dr. Subramaniam prescribed Percocet and advised her to establish care instead of using the emergency room and urgent care for her pain medications. (*Id.*). On February 22, 2008, Perry saw Dr. Rachel Marshall ("Dr. Marshall"), and requested pain medication, citing failure to receive her weekly mailed medication from the Mayo Clinic and complaining of congestion and headaches. (*Id.* at 480). Dr. Marshall prescribed Oxycontin for Perry's pain. (*Id.*). Perry saw Dr. John Walsh ("Dr. Walsh") on March 3, 2008, complaining of ongoing neck and back pain; Dr. Walsh advised Perry to schedule an appointment with orthopedics and to follow-up as necessary. (*Id.* at 479–80). Perry saw Dr. Linnea Horvat ("Dr. Horvat") on March 7, 2008, requesting pain medications. (*Id.* at 478–79). Dr. Horvat recounted Perry's multiple requests for pain medications, her use of the medications, her statement that she lost her Oxycontin, and her depletion of sixty Percocet tablets she received

---

[10]   A cervicothroacic orthosis is "a device designed to limit cervical spine motion by extending to cover more of the upper torso than a standard cervical orthosis." *Stedman's Medical Dictionary*, Orthosis (27th ed. 2000).

Oxycontin is a brand name for oxycodone, which "is used to relieve moderate to severe pain. . . . When oxycodone is used for a long time, it may become habit-forming, causing mental or physical dependence." *Oxycodone (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/oxycodone-oral route/description /DRG-20074193

Percocet is a brand name for oxycodone and acetaminophen, which "is used to relieve moderate to moderately severe pain. Acetaminophen . . . does not become habit-forming when taken for a long time. . . . When oxycodone is used for a long time, it may become habit-forming, causing mental or physical dependence." *Oxycodone and Acetaminophen (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/oxycodone-and-acetaminophen-oral-route/description/DRG-20074000.

three days prior.  (*Id.* at 478).   Dr. Horvat refused to replace the lost medication; she prescribed ibuprofen and Prilosec, while also advising Perry of the importance of having a primary care physician overseeing her pain medications.[11]   (*Id.* at 478–79).   On March 13, 2008, Perry saw Dr. Conor Lilja ("Dr. Lilja") complaining of neck pain and intermittent radicular symptoms.  (*Id.* at 476).   Perry also complained that her Oxycontin had been lost so she asked for an additional prescription.  (*Id.* at 477).   Dr. Lilja referred Perry to a neurosurgeon to see if surgery could improve her neck pain.  (*Id.*).   Dr. Lilja was concerned about Perry's use of narcotics.  (*Id.*).   Ultimately he, like the others, advised her that one physician should oversee the medications and that she should get into a pain clinic.  (*Id.*).   Dr. Lilja reported that Perry agreed to his conditions for prescribing narcotics; he prescribed Oxycontin to be used sparingly.  (*Id.*).

In April 2008, Perry followed up with Dr. Lilja after a CT scan of her cervical spine.  (*Id.* at 473).   Perry complained that she was having difficulty working because of pain and headaches.  (*Id.*).   Perry requested Oxycontin, but Dr. Lilja refused and explained that Perry had been using Oxycontin in a manner for which it was not prescribed.  (*Id.*).   Dr. Lilja urged all prescribers at Fairview Redwing to strongly consider whether Perry should be prescribed any scheduled substances.  (*Id.*).   Dr. Lilja opined that it was critical for Perry to be seen in the pain clinic.  (*Id.*).   Perry saw Dr. DeJong for neck pain a few weeks later and said she did not understand the providers at the pain clinic, and she did not plan to return to the clinic.  (*Id.* at 469).   Perry had been experiencing pain and thought she overdid it in the past few days and asked for Oxycontin.  (*Id.*).   Perry also expressed interest in physical therapy.  (*Id.*).   Dr. DeJong prescribed Oxycontin. (*Id.*).

---

[11]       Prilosec is a brand name for omeprazole, which "is used to treat certain conditions where there is too much acid in the stomach."  *Omeprazole (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/omeprazole-oral-route/description/DRG-20066836.

Perry returned to see Dr. DeJong on June 12, 2008, complaining of low back pain.  (*Id.* at 467).  Dr. DeJong advised intermittent use of heat, non-steroidal anti-inflammatory drugs ("NSAIDS"), exercise, and potentially physical therapy.[12]  (*Id.*).  Perry saw Dr. Kirk Prodzinski ("Dr. Prodzinski") on September 22, 2008, complaining of an early onset of a migraine.  (*Id.* at 464–65).  Dr. Prodzinski prescribed Flexeril and Toradol.[13]  (*Id.* at 465).  Perry saw Dr. DeJong the following day again complaining of a headache.  (*Id.* at 463–64).  Dr. DeJong wrote that Perry was no longer working, but her work restrictions had been lifted.  (*Id.* at 464).  Perry complained that the medications were not helping her headaches and pain in her right shoulder and her arm muscles, however, Dr. DeJong opined that Perry did fairly well with physical therapy for her musculoskeletal issues.  (*Id.*).  Dr. DeJong believed Perry's headache was related to her neck and back pain.  (*Id.*).  Dr. DeJong referred Perry to physical therapy and prescribed a narcotic.  (*Id.*).

Perry returned to see Dr. DeJong in April 2009, and complained of a flare-up of her neck and back pain after increased physical work with her job and stress.  (*Id.* at 455).  Dr. DeJong referred Perry to physical therapy, gave her a refill of oxycodone.  (*Id.* at 456).

---

[12]     An NSAID is a nonsteroidal anti-inflammatory drug, such as aspirin or ibuprofen. *Stedman's Medical Dictionary*, NSAID (27th ed. 2000).
[13]     Flexeril is a brand name for cyclobenzaprine, which "is used to help relax certain muscles in your body. It helps relieve the pain, stiffness, and discomfort caused by strains, sprains, or injuries to your muscles." *Cyclobenzaprine (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/DRG-20063236.
        Toradol is a brand name for ketorolac, which "is used to relieve moderately severe pain, usually pain that occurs after an operation or other painful procedure. It belongs to the group of medicines called nonsteroidal anti-inflammatory drugs (NSAIDs).  Ketorolac is not a narcotic and is not habit-forming." *Ketorolac (Oral Route, Injection Route), Description and Brand Names*, Mayo Clinic (Nov. 1, 2013), http://www.mayoclinic.org/drugs-supplements/ketorolac-oral-route-injection-route/description/DRG-20066882.

### c.    Mental Conditions

Perry has a history of depression, but explained that she thought it had worsened after her assault, which also caused increased anxiety.  (*Id.* at 482).  Dr. DeJong stated that Perry may have been suffering from post-traumatic stress disorder ("PTSD") due to the assault.  (*Id.*)  Dr. DeJong prescribed Paxil, advised her to start counseling, and completed forms for Perry to be off work for a month.[14]  (*Id.*).  Perry also saw Dr. Brian Maylon ("Dr. Maylon") in January 2008, complaining of severe anxiety including fear she would be assaulted again.  (*Id.* at 482–84).

Perry saw Dr. DeJong in July 2008, for a follow-up for depression and anxiety.  (*Id.* at 465–67).  Perry wanted to get off Paxil as it had caused weight gain and she had other side effects if she forgot a pill.  (*Id.* at 466).  Dr. DeJong and Perry agreed that she should seek counseling and Dr. DeJong weaned her off Paxil, switching her to Effexor.[15]  (*Id.* at 467).  In October 2008, Perry saw Dr. DeJong for a follow-up concerning her depression.  (*Id.* at 462).  Perry complained that the Effexor was not effective, which Dr. DeJong noted was different from the notes of her previous visit.  (*Id.*).  Dr. DeJong noted that Perry failed to seek counseling.  (*Id.* at 463).  Dr. DeJong prescribed increased Effexor and again suggested counseling.  (*Id.*).  At her appointments with Dr. DeJong, Perry was clean, adequately groomed, open, well-orientated, in contact with reality, and not having delusions.  (*Id.* at 463, 466).

---

[14]    Paxil is a brand name for paroxetine which "is used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, generalized anxiety disorder (GAD), social anxiety disorder (also known as social phobia), premenstrual dysphoric disorder (PMDD), and posttraumatic stress disorder (PTSD)."  *Paroxeine (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/paroxetine-oral-route/description/drg-20067632.

[15]    Effexor is a brand name for venlafaxine, which "is used to treat depression. It is also used to treat general anxiety disorder (GAD), social anxiety disorder (SAD), and panic disorder."  *Venlafaxine (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379.

### 2.      After May 20, 2009

After her AOD, Perry experienced continued struggles with her jaw injury, neck/spine injury, and mental conditions.   The Court again discusses the relevant medical records sequentially by injury.

#### a.      Jaw Injury

On June 8, 2009, Dr. David Basi ("Dr. Basi") performed surgery on Perry to remove the hardware in her jaw.  (*Id.* at 274–75).

#### b.      Neck/Spine Injury

On July 28, 2009, Perry saw Dr. DeJong, complaining of increased neck pain after she had moved and camped recently.  (*Id.* at 447).  Perry stated she was fine psychologically.  (*Id.* at 448).  Perry was well-nourished, had no hallucinations or delusions, was appropriate, and was not in distress.  (*Id.*).  Dr. DeJong referred Perry to a chiropractor and a physical therapist, but was uncomfortable prescribing narcotics.  (*Id.*).

On September 3, 2009, Perry had a cervical spine MRI.  (*Id.* at 321).  Perry had a history of arm tingling and a previous fracture.  (*Id.*).  The MRI revealed some residual deforming from the healed fracture and resultant stenosis that could be compressing a nerve root, no disc protrusion, and slight disc space narrowing.[16]  (*Id.* at 321–22).

Between August 2009, and October 2009, Perry attended physical therapy for her chronic neck pain with physical therapist Courtney Streit ("Streit").  (*Id.* at 307–14).  At her initial appointment with Streit, Perry complained of neck and upper back pain, headaches, tingling in upper extremities and decreased strength, endurance, flexibility, and activities of daily living.

---

[16]      "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine.  Spinal stenosis occurs most often in the neck and lower back."  *Spinal Stenosis*, Mayo Clinic (June 28, 2012), http://www.mayoclinic.com/health/spinal-stenosis/DS00515.

(*Id.* at 310–11).   Streit planned to use manual therapy techniques, education in self-care and management, and would see Perry twice weekly for four to six weeks.  (*Id.* at 313–14).   Perry returned to see Streit approximately a week later with no real change in her symptoms except increased tingling in her hands.  (*Id.* at 309–10).   After therapeutic exercises, Perry was in less pain—a result that continued at Perry's other appointments.  *See* (*id.* at 307–10).

About two weeks later, on August 26, 2009, Perry saw Streit again and noted that her headaches were improved, that a massage helped, but she experienced increased tingling in her hands and arms causing her to drop things.  (*Id.* at 309).   In addition, Perry explained that the pain in her hands and arms woke her up at night and that she would like to have an MRI of her neck.  (*Id.*).

Another two weeks later, Perry returned to Streit and reported that she had been to urgent care because of pain in her hands and arms and was given wrist splints and would schedule an appointment for carpal tunnel assessment.[17]  (*Id.* at 308, 444).   Perry reported that her neck felt better.  (*Id.* at 308).

Almost a month later Perry returned to see Streit.  (*Id.* at 307).   Perry explained that her hand pain had been better during the day, but not at night and that she had been having neck and head pain but less back pain.  (*Id.*).   In addition, Perry stated she had been receiving chiropractic cervical adjustments.  (*Id.*).   Although Streit opined that Perry needed continued physical therapy, this is the last physical therapy appointment in the Administrative Record.  (*Id.*).

---

[17]     The medical records completed during this hospital visit can be found at page 444 in the Administrative Record.

On September 24, 2009, Perry consulted with orthopedic surgeon Dr. Jonathan Sembrano ("Dr. Sembrano") per Dr. DeJong's referral.[18]  (*Id.* at 327–31).  Perry complained of neck pain, bilateral hand pain, numbness, and tingling.  (*Id.* at 329).  Dr. Sembrano took an x-ray and reviewed previous scans.  (*Id.* at 330). Dr. Sembrano opined that Perry had "C6-C7 anterior spondylolisthesis as well as a C6-C7 left foraminal compression possibly also complicated by bilateral carpal tunnel and left cubital tunnel symptoms."[19]  (*Id.*).  Dr. Sembrano ordered an upper extremity EMG and a C-spine CT scan.  (*Id.*).

On October 8, 2009, Perry had multiple spine imaging techniques performed that all showed normal motion of the cervical spine, "healed C6 and C7 fractures with mild residual spondylolisthesis and moderate left-sided foraminal stenosis[,]" and "C6-C7 anterior spondylolisthesis stable compared to initial CT scan from January 2008."  (*Id.* at 332–34, 412, 415, 416).  On the same day, Perry also saw Dr. Sembrano and he reviewed the results of the images.  (*Id.* at 413–14).  Perry complained that her neck pain was worse on the right side with equal arm symptoms.  (*Id.* at 414).  Dr. Sembrano recommended "a C7 selective nerve root block to be performed on her right side since this is the symptomatic side, even though her radiographic stenosis is worse on the left. . . [i]f she does not get significant or lasting relief from this injection, we will give consideration to performing an anterior cervical discectomy and fusion at the C6-C7 level."  (*Id.*).

---

[18]     An initial visit questionnaire completed by Perry before the September 24, 2009, appointment can be found at pages 417–24 of the Administrative Record.

[19]     Spondylolisthesis is, "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum."  *Stedman's Medical Dictionary*, Spondylolisthesis (27th ed. 2000).

On October 14, 2009, Perry underwent a consultative examination with Dr. Ward R. Jankus ("Dr. Jankus").[20]   (*Id.* at 356–58).   At the appointment, Perry complained that she experienced neck and back pain since her automobile accident in January 2008.  (*Id.* at 356). Perry explained that she took Flexeril, which helped.   (*Id.*).   Perry believed she improved approximately seventy-five percent from the time of the accident but still experienced daily neck and back pain.  (*Id.*).   Perry stated that her neck pain was usually between a five and an eight on a ten-point scale while her lower back pain was a three.  (*Id.*).   Dr. Jankus stated that Perry was cooperative.  (*Id.* at 357).   Dr. Jankus found normal alignment, a fairly well-preserved range of movement, and no real tenderness with mild to moderate palpation during a back and neck examination.  (*Id.*).   Perry stated that her pain was very deep down inside and usually cannot be located by pressing.  (*Id.*).   Dr. Jankus also noted that Perry's upper and lower extremities had normal architecture and appeared to be intact.  (*Id.* at 358).   Dr. Jankus ultimately opined that Perry had more chronic neck than low back pain with, according to Perry, a recent diagnosis from another doctor of some cervical slippage.  (*Id.*).   Dr. Jankus stated "a lifting and carrying estimate in the range of twenty pounds, give or take 5 pounds, might be pretty reasonable with the presumptive neck slippage issues[,] although clinically the range of motion is pretty well preserved at the neck and the back and, fortunately, nothing to suggest myelopathy or severe radicular damage on current exam today."  (*Id.*).

---

[20]     A consultative examination takes place "[i]f [the claimant's] medical sources cannot or will not give [the SSA] sufficient medical evidence about [the claimant's] impairment for [the SSA] to determine whether [the claimant is] disabled or blind, [the SSA] may ask [the claimant] to have one or more physical or mental examinations or tests. [The SSA] will pay for these examinations.  However, [the SSA] will not pay for any medical examination arranged by [the claimant or the claimant's] representative without [the SSA's] advance approval."  20 C.F.R. § 416.917.

On December 10, 2009, Perry followed up with Dr. Sembrano and he noted that his previous examination findings were unchanged. (*Id.* at 410). Dr. Sembrano felt surgery could be performed even without the injection being tried first if Perry found the pain unbearable. (*Id.*). Dr. Sembrano discussed the risks, benefits, and alternatives to surgery; Perry decided to have the surgery. (*Id.*). Dr. Sembrano performed the "C6-C7 anterior cervical discectomy and fusion" on January 9, 2010. (*Id.* 404–07).

Perry saw Dr. DeJong on January 18, 2010, complaining of neck and upper back pain after her surgery. (*Id.* at 518). Dr. DeJong spoke with Dr. Sembrano and confirmed that he did not intend for Perry to use as much of the medication as she had and advised that she be given a refill with instructions on weaning off the medications. (*Id.*). Dr. DeJong provided the refill with notes on weaning off and advised Perry to see her surgeon for additional refills. (*Id.*).

### c. Mental Conditions

On June 24, 2009, Perry saw social worker Lynne Staker ("Staker") for an initial session after Perry self-referred to for treatment; Perry identified her reasons for seeking treatment as "'trauma over 1 ½ years ago [and] not getting past it.'" (*Id.* at 283). Perry also complained that she felt she had lost her personality which caused her to feel fearful, angry, and anxious. (*Id.*). Perry explained that she was too scared to go to work and she believed her ex-boyfriend was stalking her and may assault her again. (*Id.*). Perry chronicled her history. (*Id.* at 284–85).[21]

In July 2009, Perry was admitted to Regions Hospital for psychosis and mania for approximately two weeks. (*Id.* at 558–60, 564, 570–72). Perry's admission to the hospital occurred after she was taken there by police because she was exhibiting abnormal behavior and

---

[21]    Approximately a week after being released from Regions Hospital, on July 29, 2009, Perry received a letter from Staker informing her that she recommended mental health services though Goodhue County Mental Health in lieu of treatment with her. (*Id.* at 287). Perry's appointments with Staker were cancelled. (*Id.*).

was having auditory and visual hallucinations with delusional thoughts.[22]  (*Id*. at 558–60, 564, 570–72).   Perry had been "sitting in the woods waiting to confront her ex-boyfriend as she believe[d] he [was] going to harm her or his child (not hers)[,]" and stated that she needed to stop her ex-boyfriend from abusing others; Perry was with her daughter who was thirteen at the time. (*Id.* at 564).   Perry refused to give urine or blood samples when admitted to the Hospital.  (*Id.* at 563, 565).   Perry stopped taking Effexor three weeks before because she no longer felt she needed it.  (*Id.* at 564).   Perry also explained that she used alcohol the night before.  (*Id.* at 565). Perry was kept on a seventy-two hour hold.  (*Id.*).   Perry had a physical therapy assessment where she explained her back and neck pain but was determined to be able to perform all transfers, bed mobility and gait independently.  (*Id.* at 581).   Perry also underwent a childcare evaluation and was determined to have adequate parenting knowledge to care for her children but her condition needed stabilization.  (*Id.* at 587–89).   Perry was discharged about two weeks after going to the hospital after an order for commitment had been issued, and was instructed to avoid alcohol and drugs, was assigned a case manager to assist in making psychiatric and therapy follow-up appointments, and would have an interim appointment at the psychiatry clinic two weeks after her discharge.  (*Id.* at 570-72).

On August 6, 2009, Perry saw Dr. Elizabeth Reeve ("Dr. Reeve").  (*Id.* at 440).   Dr. Reeve noted that Perry was doing well and was not hallucinating.  (*Id.*).   Perry stated she had been taking her medications and had mood improvements but was experiencing side effects.[23] (*Id.*). A mental status examination was administered and it was determined that Perry needed

---

[22]     The entirety of the medical records from Perry's July 2009 hospital stay can be found at pages 557–601 of the Administrative Record.  Only the relevant records are summarized here.
[23]     Perry had visited another doctor complaining of lactation side effects on August 3, 2009. (Admin. R. at 445).

continued medication, Abilify was increased and Risperdal was decreased.[24]   (*Id.* at 441).   Perry

saw Dr. Reeve again on August 27, 2009, explaining that her side effects improved after

Risperidal was tapered, but she continued to have mood swings with increased anxiety and

restlessness.   (*Id.* at 437).   Perry stated she continued in her sobriety, lived at home with her

children, and had a nurse who visited.   (*Id.*).   Dr. Reeve did not prescribe benzodiazepines for

Perry's anxiety—Perry inquired about potential use of this medication—because of their high

addiction potential.[25]   (*Id.*).   Dr. Reeve thought Abilify would help her anxiety.   (*Id.*).   Perry

followed up with Dr. Reeve on September 17, 2009.   (*Id.* at 434).   Perry had been feeling better

over the past three days, denied any mood or psychotic symptoms, paranoia, or delusions, and

reported she was not using drugs or alcohol.   (*Id.*).   Perry reported that she was stable and denied

any side effects.   (*Id.* at 436).   At both of her follow-up appointments with Dr. Reeve, Perry was

appropriately dressed and groomed.   (*Id.* at 435, 438).

On August 20, 2009, Perry underwent a neuropsychological evaluation at Goodhue

County Mental Health Center.   (*Id.* at 292–96, 389–93).   The examiner had records from a 2004

psychological evaluation, three separate appointments in 2004, and a chemical use assessment

from 2004, but no records from facilities other than Goodhue County Mental Health Center.   (*Id.*

---

[24]     Abilify is a brand name for aripiprazole, which "is used to treat nervous, emotional, and mental conditions (e.g., schizophrenia)."   *Aripiprazole (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/aripiprazole-oral-route/description/DRG-20066890.

Risperdal is a brand name for risperidone, which "is used to treat the symptoms of psychotic disorders, such as schizophrenia, mania or bipolar disorder, or irritability associated with autistic disorder."   *Risperidone (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/risperidone-oral-route/description/drg-20067189.

[25]     Benzodiazepines are "sedatives belong to a group of medicines called central nervous system depressants. Benzodiazepines may be habit-forming (causing mental or physical dependence), especially when taken for a long time or in high doses."   *Diseases and Conditions, Panic Attacks and Panic Disorder*, Mayo Clinic (May 31, 2012), http://www.mayoclinic.org/diseases-conditions/panic-attacks/basics/treatment/CON-20020825.

at 293, 390).  Perry was casually dressed, attentively groomed, pleasant, and cooperative, with a somber mood with instances of brightness.  (*Id.*).  Testing revealed that Perry's general cognitive ability was in the average range, her general fund of knowledge was at the fifth percentile, attention and memory scores in the average range to occasionally below average, poor attention to details, and essentially normal verbal information processing, while she had difficulty with integrative reasoning.  (*Id.* at 294, 391).  The examiner opined that Perry's varied problems with psychosocial experience, history of substance abuse, limited education, and probable head trauma had cumulative effects on her current condition.  (*Id.* at 294–95; 392–93).  The examiner also noted that Perry's emotional-psychological problems could independently be responsible for functional impairment and explained that her problems did not arise from any traumatic brain injury.  (*Id.* at 296, 393).

On September 14, 2009, Perry had a consultative examination with Dr. Donald Wiger ("Dr. Wiger").  (*Id.* at 297).  Dr. Wiger noted that Perry's daily activities included watching movies, doing chores, seeing friends, going shopping, driving to run errands, writing in a journal, making meals, cleaning, and attending a weekly women's support group.  (*Id.* at 298).  Perry appeared to be in good health and there was nothing abnormal about her physical appearance. (*Id.*).  Dr. Wiger observed a restricted affect but Perry was friendly and cooperative.  (*Id.*).  Perry stated that she often felt pessimistic and judged by others, which made her anxious, restless, and irritable.  (*Id.* at 299).  Perry rated her panic symptoms as not bad and stated she was depressed about half of the time, had a low self-esteem, insomnia, low energy, and feelings of hopelessness but did not have symptoms of mania or PTSD.  (*Id.*).  Dr. Wiger opined that Perry "[was] able to understand directions.  She [could] carry out mental tasks with reasonable persistence and pace.

She relate[d] not more than superficially to other people. . . [,] and with appropriate treatment, she would be able to handle the stressors of the workplace.  (*Id.* at 300).

On October 7, 2009, Perry went to the Emergency Room at Fairview Red Wing Medical Center complaining of anxiety and hearing voices; and was sent home.  (*Id.* at 315–19).

Perry saw Dr. Osekowsky multiple times after her AOD, and at many appointments Dr. Osekowsky noted that Perry was properly groomed and dressed.  *See, e.g.*, (*id.* at 549–51).  In addition, many of the appointments focused on medication management.  *See, e.g.*, (*id.* at 547–51).  Perry saw Dr. Osekowsky in October 2009, complaining of anxiety.  (*Id.* at 384–86).  Perry detailed her shifting periods of happiness and depression and anxiety and periods of extraordinary spending.  (*Id.* at 385).  Perry made good eye contact, but only had a moment of two or smiling.  (*Id*. at 386).  Perry denied delusions or hallucinations.  (*Id.*).

Perry saw Dr. Osekowsky on December 2, 2009, complaining of nightmares and nighttime anxiety since starting Lexapro while also expressing that she had been feeling a little less depressed.[26]  (*Id.* at 400).  Dr. Osekowsky noted that Perry still had trouble leaving the house but that she had more facial expression, was able to smile a little was improving but was uncomfortable.  (*Id.*).

On December 7, 2009, Dr. Osekowsky completed a Psychological Medical Report form for Perry and explained that Perry was currently depressed and avoidant but was orientated and aware with some memory issues, Dr. Osekowsky opined that Perry had a flat and depressed affect.  (*Id.* at 381, 395).  Dr. Osekowsky reported that he did not know her interests, her ability to relate to others, or really her ability to do routine tasks except that it would be difficult for her

---

[26]    Lexapro is the brand name for escitalopram, which "is used to treat depression and generalized anxiety disorder (GAD)."  *Escitalopram (Oral Route), Description and Brand Names*,  Mayo  Clinic  (Dec.  1,  2013),  http://www.mayoclinic.org/drugs-supplements/escitalopram-oral-route/description/drg-20063707.

to function.  (*Id.* at 381–82, 395–96).  Dr. Osekowsky opined that Perry's symptoms restricted her daily living.  (*Id.* at 382, 396).  He diagnosed Perry with bipolar disorder and alcohol dependency.  (*Id.*).  Relating to Perry's ability to work, Dr. Osekowsky opined that Perry's symptoms would interfere with her ability to interact or concentrate and that she would not be able to respond appropriately to work pressure, supervision, or co-workers, and that he was uncertain of her degree of potential recovery.  (*Id.*).

In March 2010, Perry reported nightmares and disrupted sleep patterns to Dr. Osekowsky.  (*Id.* at 547).  Perry had a stern affect and smiled slightly but only occasionally. (*Id.*).  Perry's condition had improved.  (*Id.*).  Dr. Osekowsky increased Effexor.  (*Id.*).

Approximately one month later, Perry returned to see Dr. Osekowsky, explaining that she did not notice any great difference in her condition but noted that her moods were not as bad and she had not been crying.  (*Id.* at 548).  Dr. Osekowsky noted that Perry was smiling more, and he thought progress was being made.  (*Id.*).

About two months later in June 2010, Perry followed up with Dr. Osekowsky complaining of dizziness and tremors.  (*Id.* at 549).  Dr. Osekowsky opined that the medications were effective as Perry had been improving even with a reduction in Abilify.  (*Id.*).

In August 2010, when Perry returned for a follow-up, Perry gained more weight but was managing much better than in October 2009.  (*Id.* at 550).  Perry complained of feeling overwhelmed by everything she had to deal with, making her feel she could not work.  (*Id.*).  Dr. Osekowsky explained that although Perry could smile, her affect was flat but she was taking

better care of herself.  (*Id.*).  Dr. Osekowsky continued Abilify, lowered Effexor and Quetiapine, and discontinued benzotropine.[27]  (*Id.*).

Perry saw Dr. Osekowsky in November 2010, denying any overt psychotic symptoms, but experienced concern about how little she talked, her interrupted sleep, and her continued weight gain.  (*Id.* at 551).  Perry advised Dr. Osekowsky that she stopped taking her Abilify without consulting him because the dose had already been reduced and her pharmacy did not have the correct dose.  (*Id.*).  Perry was able to smile and appreciate humor and was substantially improved.  (*Id.*).

Perry next saw Dr. Osekowsky in January 2011.  (*Id.* at 552).  Perry was managing pretty well emotionally.  (*Id.*).  Perry made good eye contact, was able to smile with brightness, and communicated adequately.  (*Id.*).  As instructed, Perry followed up with Dr. Osekowsky in April 2011, and she "appear[ed] affectively brighter, ma[de] excellent eye contact, ha[d] a bright smile, and [was] hopeful."  (*Id.* at 553).  Perry had rekindled a relationship with the father of one of her children and they were living together and planning marriage.  (*Id.*).  Perry was manic for the first two weeks of the new living situation and had quit nursing training because she was not able to focus.  (*Id.*).  Perry liked Abilify and felt better on the medication.  (*Id.*).  Perry was substantially improved over her first visit.  (*Id.*).

---

[27]      Quetiapine "is used to treat nervous, emotional, and mental conditions (e[.]g[.], schizophrenia)."  *Quetiapine (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/description/drg-20066912.
      Benzotropine "is used with other medicines to treat Parkinson's disease. By improving muscle control and reducing stiffness, this medicine allows more normal movements of the body as the disease symptoms are reduced. It is also used to control severe reactions to certain medicines that are used to treat nervous, mental, and emotional conditions[.]"  *Benztropine (Oral Route), Description and Brand Names*, Mayo Clinic (Nov. 1, 2013), http://www.mayoclinic.org/drugs-supplements/benztropine-oral-route/description/drg-20072652.

In June 2011, Dr. Osekowsky completed a Mental Impairment Questionnaire for Perry. (*Id.* at 602–07). Dr. Osekowsky explained that Perry's current Global Assessment Functioning ("GAF") score was 55, which was the highest in the past year and that Perry's treatment progress was such that she was not currently in need of hospitalization. (*Id.* at 602). Dr. Osekowsky noted that Perry could make impulsive decisions and engage in unusual behavior, but Perry may improvement with long-term medication and support services. (*Id.*). Dr. Osekowsky completed a checklist for Perry's ability to function in a work setting and indicated that Perry's ability to maintain regular attendance, punctuality, and ability to complete a work day without interruptions from her psychological symptoms which Dr. Osekowsky rated Perry as unable to meet competitive standards. (*Id.* at 604). All other abilities ranked by Dr. Osekowsky were rated as unlimited or very good, limited but satisfactory, or seriously limited but not precluded. (*Id.*). Dr. Osekwosky also opined that Perry would be unable to meet competitive standards for dealing with the stress of a workplace because of her emotional and paranoid symptoms that made her preoccupied and overwhelmed. (*Id.* at 605). Dr. Osekowsky further explained that Perry was preoccupied with non-work-related issues. (*Id.*). Perry had moderate restrictions on her activities of daily living, and difficulties in social functioning, marked difficulties in maintaining concentration, persistence, and experienced one or two episodes of decompensation within a twelve month period each lasting at least two weeks. (*Id.* at 606). Dr. Osekowsky opined that Perry would be absent from work more than four days per month. (*Id.* at 607). Dr. Osekowsky explained that Perry's alcohol dependence contributed to her limitations and that her impairments were reasonably consistent with her symptoms and functional limitations. (*Id.*).

### 3.      State Agency Medical Consultants' Opinions

Due to Perry's both physical and mental impairments, State Agency consultants assessed

Perry's Physical Residual Functional Capacity ("RFC") and her Mental RFC.

### a.      Physical RFC

On November 5, 2009, State Agency consultant Dr. Matthew Hofkens ("Dr. Hofkens")

completed a physical RFC assessment.  (*Id.* at 362–69).  After reviewing Perry's file, Dr.

Hofkens opined that Perry could occasionally lift or carry twenty pounds, could frequently lift or

carry ten pounds, could stand or walk with normal breaks for about six hours in an eight-hour

work day, could sit with normal breaks for about six hours in an eight-hour work day, and could

push or pull an unlimited amount of weight.  (*Id.* at 363).  Dr. Hofkens noted that Perry's alleged

lower back pain had seen gradual improvement without weakness in her lower extremities or

significant radiological abnormalities and that the consultative examination showed that Perry

had normal cervical and lumbar range of motion without pain elicitation.  (*Id.* at 363–64).  Dr.

Hofkens opined that Perry could frequently climb ramps or stairs, balance, stoop, kneel, crouch,

and crawl.  (*Id.* at 364).  Dr. Hofkens limited Perry to never being able to climb ladders, rope, or

scaffolds.  (*Id.*).  Dr. Hofkens opined that Perry had no manipulative, visual, communicative, or

environmental limitations.  (*Id.* at 365–66).

At the reconsideration level, on January 29, 2010, State Agency consultant Dr. Dan

Larson ("Dr. Larson") reviewed additional evidence submitted after Dr. Hofkens's assessment at

the initial level.  (*Id.* at 541–43).  The additional information included updated records showing

that Perry had a "C6-C7 anterior cervical discectomy and fusion" without complications and a

decrease in activities of daily living which could have been due to recuperation since it was

reported only ten days after surgery.[28]   (*Id.* at 543).   Dr. Larson affirmed Dr. Hofkens's assessment.  (*Id.* at 542).

### b.    Mental RFC

On October 29, 2009, State Agency consultant Dr. J. Larsen ("Dr. Larsen") reviewed the record and completed a mental RFC assessment and a psychiatric review technique ("PRT").[29] (*Id.* at 336–53).  In the Mental RFC, Dr. Larsen concluded the following:

> GAF is lower 50s which indicates no more than moderate serious limitations in adaptive functioning.  ADLs [activities of daily living] indicate that the claimant is able to perform a wide range of tasks[.]  [Perry] has some difficulty getting along with others.  However, [Perry] can cooperate and tolerate the casual interactions necessary to perform tasks.  [Perry] has friends with whom she interacts and goes out. [Perry] has a long work history. [P]sychological treatment is reported.  Attention and concentration are moderately impaired.  [Claimant] no longer uses any substances.  . . . [Perry's conditions] could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and their impact on function are not consistent with the totality of the evidence. [Perry] appears to have the cognitive abilities and concentration necessary to complete tasks. [She] can make work[-]related decisions, remember locations and remember work[-]like procedures.  Pace appears to be [within normal limits] and [Perry] could attend to a 2[-]hour task.  [She is] capable of maintaining a

---

[28]    A discectomy is an "[e]xcision, in part or whole, of an intervertebral disk."  *Stedman's Medical Dictionary*, Spondylolisthesis (27th ed. 2000).

[29]    The Psychiatric Review Technique is:

> described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

*Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996).

schedule.   [Perry] might prefer to avoid public contact.   While [Perry's] impairments might interfere with complex task completion inherent in past work, they would allow for the completion of other tasks.

(*Id.* at 338) (formatting changed).[30]

In the PRT, Dr. Larsen opined that Perry did not meet the criteria for any of the following listings: 12.04, Affective Disorders; 12.06, Anxiety-Related Disorders; 12.08, Personality Disorders; or 12.09, Substance Addiction Disorders.[31]  (*Id.* at 344, 346, 348–49).  In considering the "Paragraph B" criteria, Dr. Larsen opined that Perry was mildly limited in her activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace, and had one or two episodes of decompensation each of extended duration.[32]  (*Id.* at 351).

At the reconsideration level, on January 29, 2010, State Agency consultant Dr. R. Owen Nelsen ("Dr. Nelsen") reviewed additional evidence including Perry's neck fusion surgery, her opinion that she is emotionally incapable of working, and her psychiatric hospitalization in July 2009.  (*Id.*at 544–46).  Dr. Nelsen affirmed Dr. Larsen's assessment.  (*Id.* at 545).

### D.    Vocational Expert Testimony

Steve Bosch ("Bosch") testified as a vocational expert ("VE") at the hearing before the ALJ.   (*Id.* at 51–55).   Bosch holds a Bachelor's of Science Degree from Mankato State University and a Master's of Science Degree from Drake University.  (*Id.* at 112).  The ALJ asked the VE whether a younger person, as defined in the applicable statutory sections; with a

---

[30]     To see a checklist completed by Dr. Larsen supporting his conclusions concerning Perry's mental RFC, see pages 336 to 337 of the Administrative Record.

[31]     Section 12 includes a list of mental disorders which is organized into nine categories. *See* 20 C.F.R. § 404 App. 1, 12.00(A).

[32]     Paragraph B criteria refers to "a set of impairment-related functional limitations."  20 C.F.R. § 404, app. 1, § 12.00(A).  These requirements and the process for making a disability determination under the Social Security Act for mental disorders is discussed more below in the Section entitled "The ALJ's Decision," *infra* at Section E.

high school equivalent education; no difficulties with communication; an RFC for light work with the restrictions that there be no ropes, ladders, or scaffolds, and must avoid hazardous machinery; who could perform repetitive three to four step tasks, have brief and superficial contact with co-workers and the public; and could handle minimal changes and stressors in the workplace could perform any of Perry's past work. (*Id.* at 51). The VE stated that such a person could not perform any of Perry's past work. (*Id.*).

The ALJ then asked whether a person with Perry's age, education, and work experience with the limitations outlined in the first hypothetical could perform other jobs in the regional or national economy. (*Id.* at 52). The VE testified that such a person could work as a housekeeper/cleaner which is light and unskilled work, convenience food worker which is light and unskilled work, or as a molding machine tender (plastic or rubber injection mold tender), which is light and unskilled work. (*Id.*). The VE testified that if such a person was sedentary, however, that person could perform as a final optical assembler, which was at the sedentary level and unskilled. (*Id.* at 52–53). This testimony was based on the VE's experience and employment numbers from the Minnesota Department of Economic Security and was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id.* at 53).

The VE testified missing more than four days of work a month would preclude competitive employment. (*Id.* at 54). In addition, if Perry was "unable to meet competitive standards, [or] complet[e] a workday or workweek without interruptions from psychologically based symptoms," it would preclude her competitive employment. (*Id.* at 54–55).

### E.   The ALJ's Decision

On July 18, 2011, the ALJ issued a decision finding that Perry was not disabled under sections 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act. (*Id.* at 27). The ALJ

reached his conclusion after following the required five-step evaluation.  *See* (*id.* at 15–27).  The ALJ considered: (1) whether Perry was engaged in substantial gainful activity; (2) whether Perry had a severe medically determinable impairment or a severe combination of impairments; (3) whether Perry's impairment or combination of impairments meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings");[33] (4) whether Perry could return to her past work; and (5) whether Perry could do any other work in light of her RFC, age, education, and work experience.  *See* 20 C.F.R. §§ 404.1520(a)–(f), 416.920(a)–(f); (Admin. R. at 16–27).

At the first step, the ALJ found that Perry had not engaged in substantial gainful activity since May 20, 2009, which was the AOD.  (Admin. R. at 17).

At the second step, the ALJ found that Perry had three severe impairments: degenerative disc disease, affective disorder, and a history of alcohol abuse/dependence—in remission.  (*Id.*).  Perry's history of "comminuted moderately displaced mandible fracture of the right body and left body[,]" was not severe because did not cause more than a minimal impact on Perry's performance of basic work-related tasks.  (*Id.* at 17–18).

At step three, the ALJ determined that Perry did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Listings.  (*Id.* at 18).  Perry's degenerative disc disease did not meet a listing because she did not have "evidence of nerve root compression . . . limitation of motion in the spine, motor loss     . . . accompanied by sensory or reflex loss, and, in connection with the lumbar spine impairment, also a positive straight leg raising test[.]"  (*Id.*).

---

[33]     Before Step Four, the ALJ must make an RFC determination.  (*Id.* at 16).

Perry's mental impairments neither singularly nor in combination met or medically equaled Listing 12.04 or 12.09.[34]   (*Id.*).   In making this determination, the ALJ considered whether "Paragraph B" requirements were satisfied.[35]   (*Id.*).   To meet "Paragraph B" requirements, a mental impairment must cause at least two of the following: (1) marked restriction[36] of daily living activities; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining "concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."[37]   (*Id.* at 18).   The ALJ based his decision on most of these factors on a third-party function report from Perry's friend, Ronald Vonbargen ("Vonbargen"); Perry's function report; and Dr. Wiger's report.   (*Id.* at 18–19).

---

[34]     Section 12 lists mental disorders in nine diagnostic categories.  20 CFR 404, App. 1, § 12.00(A).  Section 12.04 applies to affective disorders and Section 12.09 applies to substance addiction disorders.  *Id.*

[35]     The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. . . . Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06, discussed herein. We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.

20 C.F.R. § 404, app. 1, § 12.00(A).  "The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description that is manifested by the medical findings in paragraph A." 20 C.F.R. § 404 app. 1, 12.00(A).

[36]     The ALJ defined a marked limitation as "more than moderate but less than extreme." (Admin. R. at 14).

[37]     The ALJ defined extended duration as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."   (*Id.*).

Perry had a mild restriction in her activities of daily living.[38] (*Id.* at 18). Vonbargan explained that Perry was capable of performing normal daily activities like "taking medications, cleaning, cooking, chores and maybe [a] visit with a friend[,]" and struggled with house and yard work because of her pain, but was able to complete the tasks, and she enjoyed "rollerblading, canoeing[,] and gardening." (*Id.*). In Perry's own function report, she explained that she was "able to perform her activities of daily living independently despite her pain." (*Id.*). In addition, Dr. Wiger, the consultative examiner, reported that Perry daily "watche[d] movies, [did] chores, [saw] friends, [went] shopping and live[d] in a house with three children ages 8, 10, and 13[,]" while also having three meals a day and having appropriate hygiene. (*Id.*).

Perry had moderate difficulties in social functioning.[39] (*Id.* at 18–19). Vonbargen reported that Perry talked with others for about twelve hours a week and attended social groups.

---

[38]     Activities of daily living are defined as "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction."  20 C.F.R. § 404 app. 1 12.00(C)(1).

[39]     Social functioning is defined as:

> your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

(*Id.* at 18).  Perry herself reported that she talked with friends on the phone and computer, drove to friends' houses to help cook and clean up about five days of the week.  (*Id.* at 18–19).  Dr. Wiger reported that Perry identified two friends but that she can have trouble being accepted. (*Id.* at 18).  Dr. Wiger also reported that although Perry contended she did not like to be around people, she saw friends and was able to shop.  (*Id.*).

Perry had moderate difficulties in concentration, persistence, or pace.[40]   (*Id.* at 19). Vonbargen explained that Perry had a limited attention span, and was able to follow written instructions, but had difficulty with spoken instructions.  (*Id.*).  Dr. Wiger reported that during the consultative examination Perry was able to hold a normal conversation and was in touch with reality.  (*Id.*).  In addition, Dr. Wiger explained that Perry completed the following during her consultative examination: "counted by 3's beginning with one[,]" "said the months of the year forward and backward[,]" "correctly spelled the word "world" forward and backward[,]" "repeated seven digits forward and four digits backward[,]" "recalled three of three words immediately and after five and thirty minutes[,]" and "knew the names of four out of four of the most recent presidents."  (*Id.*).  Perry was not able "to count backward from 100 by 7's."  (*Id.*). Dr. Wiger reported that Perry had adequate concentration.  (*Id.*).

---

20 C.F.R. § 404app. 1, 12.00 (C)(2).

[40]        Concentration, persistence, or pace is defined as:

> the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

20 C.F.R. § 404 app. 1, 12.00(C)(3).

Perry had experienced no episodes of decompensation that were of extended duration.[41]

(*Id.*).  The ALJ explained "[t]here is no indication in the record that [Perry] ha[d] experienced any episodes of decompensation, each of extended duration, as hallmarked by psychiatric hospitalization, enrollment in day treatment, or any increase in outpatient psychotherapy for an extended period[.]"  (*Id.*).  Perry was hospitalized in July 2009 for psychiatric issues, as summarized above.  *See*, *supra* § (C)(2)(c), entitled "Mental Conditions."  The parties, however, do not dispute that this should have qualified as an episode of decompensation.  Moreover, even if this hospitalization was an episode of decompensation of extended duration, Perry still could not establish the repeated episodes of decompensation of extended duration as set forth in the applicable regulations.  *See*, *supra* n. 41.

---

[41]   Episodes of decompensation are defined as:

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.
>
> The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.  If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. § 404 app. 1, 12.00(C)(4).

Because the ALJ did not find Perry's mental impairments to cause at least two marked limitations or a marked limitation and repeated episodes of decompensation of extended duration, the "Paragraph B" criteria were not satisfied. (*Id.*). Consequently, the ALJ considered whether "Paragraph C" requirements were satisfied and found they were not.[42] (*Id.*).

The ALJ next determined that Perry had the RFC

to perform light work . . . except [Perry] is limited to work with no climbing of ropes, ladders[,] or scaffolds and [Perry must] avoid hazardous machinery and unprotected heights[, and is] further limited to routine, repetitive 3–4 step tasks and brief and superficial contact with co-workers and the public with minimal stressors and changes in the routine, repetitive work setting.

(*Id.*). The RFC determination was based on all of Perry's symptoms to the extent they were consistent with objective medical evidence, and opinion evidence was considered. (*Id.* at 20).

The ALJ applied the requisite two-step test for considering Perry's symptoms. (*Id.*). He first determined whether an underlying impairment(s) that could produce Perry's pain and symptoms and next evaluated "the intensity, persistence, and limiting effects of [Perry's] symptoms to determine the extent to which they limit [Perry's] functioning." (*Id.*). Whenever such statements about Perry's symptoms were not substantiated by the record medical evidence, the ALJ made a credibility determination of the statements based on the entire record. (*Id.*).

The ALJ found Perry's impairment could reasonably be expected to cause the alleged symptoms, but that Perry's "statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the [RFC.]"[43] (*Id.* at

---

[42]      Paragraph C criteria "are used to rate the severity of mental impairment(s)." 20 C.F.R. § 404, app. 1, § 12.00(A).

[43]      In the Eighth Circuit, *Polaski v. Heckler* provides the governing factors for a credibility determination. 739 F.2d 1320, 1322 (8th Cir. 1984). In assessing subjective complaints of pain, an ALJ must examine several factors including: "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Brown v.*

20–21).  In light of his determination, the ALJ considered, in addition to the objective medical evidence, Perry's daily activities, Perry's pain, aggregating factors, any medications she took and their effects, other treatment Perry has used to relieve her pain, and any factors concerning Perry's functional limitations and restrictions from her pain.  (*Id.* at 20).  Perry claimed she was unable to work because of "a broken jaw, broken neck, chronic pain[,] and bipolar [disorder.]" (*Id.* at 20).  Perry also claimed that her pain was constant and only tolerable sometimes.  (*Id.*).  In addition, Perry stated that she "ha[d] a flight of ideas, [was] paranoid, [had] pain in back, arms, neck, face[,] shoulders[,] and sometimes into her legs and feet."  (*Id.*).

The ALJ highlighted the following objective medical evidence relating to Perry's mental symptoms in reaching his decision concerning Perry's credibility.  (*Id.* at 21–24).  In June 2009, Perry referred herself to the Behavioral Health Department of Fairview Red Wing Health Services citing her failure to overcome trauma from a year and a half prior.  (*Id.* at 21).  Perry was admitted to Regions Hospital Behavioral Health Unit for psychosis in July 2009.  (*Id.*).  In August 2009, Perry had a neuropsychological examination where testing revealed Perry had an average general cognitive ability while her general fund of knowledge was in only in the fifth percentile.   (*Id.*).  At a consultative examination, Dr. Wiger diagnosed Perry as having "dysthymic disorder; generalized anxiety disorder; history of alcohol abuse[;] and borderline personality disorder with significant paranoia symptoms[.]"  (*Id.* at 21–22).  In October 2009, State Agency consultants reviewed Perry's record and determined that she "appear[ed] to have the cognitive abilities and concentration necessary to complete tasks, and [could] make work related decisions, remember locations[,] and remember work[-]like procedures."  (*Id.* at 22).  The

---

*Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (citing *Polaski*, 739 F.2d at 1322).  Other relevant factors are the claimant's work history and objective medical evidence.  *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999).

ALJ also considered the treatment notes from Dr. Osekowsky, which showed improvement and showed that medications were effective in treating Perry. (*Id.*). The ALJ also considered mental status examinations in the record, which revealed that Perry was casually groomed; had a restricted affect; a fine mood most times; orientated to person, place, and time; age and developmentally appropriate concentration; intact recent and remote memory; and limited insight and judgment. (*Id.*). The ALJ also noted Perry's GAF scores ranged from fifty to fifty-four. (*Id.*).

The ALJ highlighted the following objective medical evidence relating to Perry's physical symptoms in reaching his decision of Perry's credibility. (*Id.* at 23–24). At CT scan of Perry's thoracic and lumbar spine was negative for fractures and dislocations and showed normal spinal alignment. (*Id.* at 23). By January 2009, Perry's fractures had healed. (*Id.*). In April 2009, treatment records reported that despite Perry's past cervical fracture in her neck, she had "done well for quite some time and she reported she [was] doing a lot more physical work with her job[.]" (*Id.*). In October 2009, Dr. Jankus reported Perry had normal alignment, and a fairly well-preserved range. (*Id.*).

State Agency consultants' review of Perry's record resulted in their opinion that Perry could lift twenty pounds occasionally, ten pounds frequently, and could "stand and or walk 6 hours and sit 6 hours in an 8-hour workday; and never climb ladders, ropes or scaffolds[.]" (*Id.*).

A CT scan of Perry's cervical spine in October 2009, showed a healed fracture. (*Id.*). Perry complained of continuing chronic neck pain and bilateral forearm numbness and tingling, which nonoperative treatment did not quell. (*Id.*). In January 2010, Perry had a neck fusion surgery. (*Id.*). The ALJ explained that overall, Perry's physical examinations have shown that she is well developed and nourished with no evident distress and a normal gait. (*Id.*).

Concerning Perry's activities of daily living, the ALJ determined that Perry's "allegations of disability [were] less than fully credible as the weight of the objective findings [did] not corroborate the level of the limitation [she alleged]." (*Id.* at 24).  Although Perry testified that she had a limited ability to perform activities of daily living Perry also testified that she lived with her children and was responsible for their care and the record evidence provided examples her performance of independent activities of daily living.  (*Id.*).

 Concerning Perry's medication, the ALJ reported that Perry had been prescribed and had taken appropriate medications for her alleged impairments, which were relatively effective in managing Perry's symptoms.  (*Id.*).

Concerning other methods of treatment for Perry's condition, the ALJ explained that Perry had surgery for her alleged impairment, which would normally weigh in her favor but was offset by record evidence explaining the surgery was generally successful in providing Perry with pain relief.  (*Id.*).  In fact, the ALJ observed after Perry's January 2010 surgery, the record contained few treatment notes for the condition.  (*Id.*).  In addition, Perry testified that she was unable to work because of her pain, but that she was infrequently prescribed pain medications. (*Id.*).  Also, the ALJ explained there was no evidence in the record that after the surgery, Perry sought any additional treatment like physical therapy.  (*Id.*).  The ALJ opined that the evidence suggested that Perry had pain from her impairment but it was not as severe as she alleged.  (*Id.*).

Concerning Perry's work history the ALJ explained that there was evidence that she discontinued working for reasons (including personal safety concerns, health issues, and Perry's failure to follow policies) other than her allegedly disabling impairments.  (*Id.*).  The ALJ explained that Perry last worked as a personal care assistant for six months where she did a good job, had perfect attendance, but quit due to personal safety concerns.  (*Id.*).  She previously

worked as a nursing assistant at Redwing Healthcare Center for a year and a half, but quit after her automobile accident.  (*Id.*).  Perry worked as a nursing assistant at Seminary Homes previously, but she was fired because she failed to show up without calling. (*Id.*).

Concerning the opinion evidence in the record, the ALJ considered the following opinions and provided them the weight identified below.  (*Id.* at 25).  The ALJ afforded great weight to the opinion of the consultative examiner Dr. Wiger because he found Dr. Wiger's opinions supported by record evidence.  (*Id.*).  Dr. Wiger opined that Perry was capable of handling workplace stress, was able to understand directions, could carry out mental tasks with reasonable persistence and pace, and related no more than superficially to others.  (*Id.*).  Dr. Wiger both evaluated Perry and reviewed a psychological report from Perry's social worker. (*Id.*).

The ALJ considered the opinion of the consultative examiner Dr. Jankus that Perry "could lift and carry estimate in the range of 20 pounds" and found it supported by the record evidence and Perry's physical examinations.  (*Id.*).  The ALJ adopted Dr. Jankus's opinion about Perry's ability to lift and carry.  (*Id.*).

The ALJ adopted and afforded great weight to the opinions of the State Agency consultants.  (*Id.*).  The ALJ explained that despite not being treating physicians, the State Agency consultants' opinions deserved great weight because there existed other evidence throughout the record supporting their opinion that Perry was not disabled.  (*Id.*).

The ALJ afforded little weight to the opinion of treating physician Dr. Osekowsky because he found that Dr. Osekowsky's opinions concerning Perry's limitations were inconsistent with his own treatment notes indicating improvement.  (*Id.*).  The ALJ also found no record evidence supporting Dr. Osekowsky's opinion that Perry would be absent from work

36

more than four days a month because of her impairments. (*Id.*). The ALJ explained that the record did not contain any opinions from treating or examining physicians, other than that of Dr. Osekowsky, which indicated that Perry had physical limitations greater than the RFC. (*Id.*).

The ALJ considered the statement from Vonbargen, Perry's friend, and found that although his statement did corroborate Perry's testimony concerning her daily activities, Vonbargen was not a medical source. (*Id.*). The ALJ accordingly determined that Vonbargen's statement was "of little if any value in determining the extent to which [Perry's] limited daily activities are a result of [her] medical impairments." (*Id.*).

At step four, the ALJ determined that Perry was unable to perform any of her past relevant work, which was supported by the VE's testimony. (*Id.* at 26).

At step five, the ALJ explained that given Perry's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Perry could perform. (*Id.*). The ALJ specifically relied on the VE's testimony which identified that a person of Perry's age, education, work experience, and RFC could work as a cleaner/housekeeper, a convenience food worker, or a molding machine tender (plastic or rubber machine tender) in reaching his conclusion. (*Id.* at 26–27). Therefore, the ALJ found that Perry was not disabled under 20 C.F.R. § 404.1520(g) and § 416.920(g). (*Id.* at 27).

## II.    STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]" 42 U.S.C. § 423(d)(1)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  *Id.* § 423(d)(2)(A).

### A.  Administrative Record

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review.   20 C.F.R. §§ 404.929, 416.1429.  If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic.  *Id.* §§ 404.967–.982, 416.1467.  If the Appeals Council denies the request for review, then the ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court.  42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.  An appeal to a federal court of either the Appeals Council or the ALJ's decision must occur within sixty days after notice of the Appeals Council's action.  *Id.*

### B.  Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive.  42 U.S.C. § 405(g).  The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'"  *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)).  A court's task is limited to

reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted) (quoting *Jackson v. Bowen,* 873 F.2d 1111, 1113 (8th Cir. 1989)).

In reviewing the ALJ's decision, the Court analyzes the following factors:  (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of

production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355.  If substantial evidence on the record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

Perry raises multiple arguments in support of her Motion for Summary Judgment.  First, Perry argues that the ALJ erred by "not accepting the well-founded treating doctor's opinion and replacing it with the opinions of non-treating, non-examining physicians."  (Perry's Mem. in Supp. at 10–12).   Second, Perry argues that the ALJ misstated and mischaracterized Dr. Osekowsky's treating and progress notes in order to "create a conflict between those notes and Dr. Osekowsky's Medical Source Statement."  (*Id.* at 12–14).  Third, Perry argues that the ALJ erred in reaching his decision because there was no record evidence establishing that Perry "could work on a regular and continuing basis."  (*Id.* at 14–15).  Thus, according to Perry, substantial evidence does not support the ALJ's decision.  *See generally* (*id.*).

### A.   Weight Afforded to Medical Opinions in RFC Determination

Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding.  20 C.F.R. § 404.1527(c)(2).  In fact, when supported by proper medical

testing, and not inconsistent with other substantial evidence on record, the ALJ will give such opinion controlling weight. *Id.* "However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (citation and internal quotation omitted) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

Treating physicians' opinions are to be given no weight when they address "questions reserved for the Commissioner—such as whether a claimant is disabled, or is unable to work . . . ." *Ahlstrom v. Astrue*, No. 08-CV-5768 (RHK/RLE), 2010 WL 147880, at *23 (D. Minn. Jan. 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)).  In addition, an ALJ need not accord deference to a treating physician's opinion that "consist[s] of nothing more than vague, conclusory statements." *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996).  "[S]tatements that a claimant could not be gainfully employed are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) (citing *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996)).

When deciding what weight to afford to any medical opinion, an ALJ considers the following factors:

> (1) whether the source has examined the claimant; (2) the length, nature and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Leach v. Astrue*, No. 10-CV-4279 (SRN/JSM), 2011 WL 7468635, at *17 (D. Minn. Aug. 5, 2011), *report and recommendation adopted*, 2012 WL 760772 (Mar. 8, 2012) *aff'd*, 496 F. App'x 681 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)); *Wagner v. Astrue,* 499 F.3d 842, 848 (8th Cir. 2007)).

First, the parties do not dispute that Dr. Osekowsky is a treating physician.  Here, the ALJ afforded little weight to Dr. Osekowsky's opinions about Perry's limitations.  (Admin. R. at 25). The ALJ afforded such weight because he found Dr. Osekowsky's opinions concerning Perry's limitations were inconsistent with his own treatment notes that showed improvement.  (*Id.*).  In addition, the ALJ found Dr. Osekowsky's opinion that Perry would miss more than four days of work a month because of her impairments was unsupported by the record.  (*Id.*).  Specifically pertaining to Perry's limitations from her mental impairments, "the record [did] not contain any opinions from treating or examining physicians indicating that the claimant has physical limitations greater than those determined in this decision."  (*Id.*).

While the opinion of a treating physician is generally given more weight than other sources in a disability proceeding, the ALJ here properly afforded little weight to the opinion of treating psychiatrist Dr. Osekowsky by outlining how his opinions were inconsistent with his own notes showing improvement and/or were not supported by other record evidence.  *See* (*id.*). For example, during his treatment of Perry, Dr. Osekowsky starting noting improvements in Perry's condition in December 2009, the second appointment Perry had with Dr. Osekowsky, and those improvements continued throughout 2010 and 2011.  (*Id.* at 400, 547–53).  Moreover, both Dr. Osekowsky and Perry stated that medications helped her condition, further evidencing improvement in Perry's condition.  *See Green v. Astrue*, 390 F. App'x 620, 622 (8th Cir. 2010) (citing *Schultz v. Astrue,* 479 F.3d 979, 983 (8th Cir. 2007); *Polaski v. Heckler,* 739 F.2d 1320,

1322 (8th Cir.1984) ("[Claimant] reported improvement of her mental health subsequent to medication changes, which the ALJ appropriately considered.")); (Admin. R. at 549, 553);.

Perry argues although Dr. Osekowsky noted improvement, he did not state that her impairments were cured or controlled.   (Perry's Mem. in Supp. at 13).  This argument is not persuasive as the ALJ did not find that Perry's mental conditions were controlled or cured, only that they had improved under Dr. Osekowsky's care.   (*Id.* at 25).   In addition, the Court is not persuaded by Perry's argument that Dr. Osekowsky's psychological medical report, which opined that it would be very difficult for Perry to function even at routine tasks given the severity of her symptoms, illustrates that Dr. Osekowsky's treatment notes do not actually conflict with his opinions as to Perry's limitations.   (Perry's Mem. in Supp. at 13); (Admin. R. at 381–82, 395–96, 602–07).   Perry's argument relies on a psychological medical report completed in December 2009, near the beginning of the treatment relationship between Perry and Dr. Osekowsky.   (Perry's Mem. in Supp. at 13); (Admin. R. at 381–82, 395–96, 602–07). When considered on the whole, Dr. Osekowsky's treatment notes show improvement in Perry's condition over the course of their treatment relationship.  *See, e.g.*, (Admin. R. at 384–87, 547–53).   Perry's citation to one piece of these notes, Dr. Osekowsky's psychological medical report penned at an early stage in the treatment relationship that opined Perry would have a very difficult time functioning given her symptoms, does not undermine the effect of the treatment notes considered as a whole evidencing improvement.   *See, e.g.*, (Admin. R. at 384–87, 547–53) (explaining Perry's improvement during Dr. Osekowsky's treatment).

Perry's citations to Dr. Osekowsky's treatment notes explaining that Perry had a flat affect, had interrupted sleep, and had to quit nursing school, likewise, do not undermine the fact that Dr. Osekowsky's treatment notes, considered as a whole, show improvement in Perry's

condition.  *See* (Perry's Mem. in Supp. at 12–14).  Perry points to these treatment notes in an attempt to show that her improvement was primarily in her ability to smile; Perry argues she continued to struggle under Dr. Osekowsky's care.  (*Id.*); (Perry's Reply Mem. "Perry's Reply") [Doc. No. 13 at 4].  The Court is unconvinced, after evaluating the relevant treatment notes from Dr. Osekowsky, that Perry's main improvement was in her ability to smile, as Perry contends. (Perry's Mem. in Supp. at 15).  For example, in June 2010, Dr. Osekowsky noted that Perry had improved despite reduction in her Abilify, and in November 2010, Dr. Osekowsky opined that Perry was "substantially improved over her status on admission" even though she had discontinued Abilify.  (Admin. R. at 549, 551).  Moreover, in April 2011, Dr. Osekowsky again opined that Perry was "substantially improved over admission."  (*Id.* at 553).   In addition, the Court does not believe that the ALJ equated improvement with being cured, as Perry contends. (Perry's Reply at 3).  The ALJ expressly found that Perry had severe impairments, including affective disorder and a history of alcohol abuse in remission.  (Admin. R. at 17).

The Court also finds that Dr. Osekowsky's opinion that Perry would miss more than four days of work a month was properly afforded little weight by the ALJ because this opinion was unsupported by other evidence in the record.  *See* (*id.* at 25).  Perry argues that the ALJ should have used this limitation because Dr. Osekowsky's opinion on Perry's absence was well-founded and although Perry improved over the course of treatment, it was mainly in her ability to smile as her GAF scores only increased by five points.  (*Id.*).   In her reply, Perry again argues that Dr. Osekowsky's opinion about Perry's absence should have been afforded greater weight because "he knows his patient" and his treatment notes are not in conflict with this opinion.  (Perry's Reply at 3).  Perry does not cite evidence outside of Dr. Osekowsky's own statements that Perry would miss more than four days of work a month to establish such a limitation and therefore her

arguments are essentially undeveloped.  *See* (*id.*); (Perry's Mem. in Supp. at 14–15).  Because

Perry does not provide any substantiation of or support for this argument it is waived.  *See Ollila*

*v. Astrue*, No. 09-CV-3394 (JNE/AJB), 2011 WL 589037, at *11 (D. Minn. Jan. 13, 2011) *report*

*and recommendation adopted*, 2011 WL 589588 (D. Minn. Feb. 10, 2011) (citations omitted).

Moreover, even if the argument was not waived it would still fail.  The ALJ properly

afforded Dr. Osekowsky's opinion concerning Perry's absence little weight under 20 C.F.R. §

404.1527(c)(2) because he also found that there was no support for this level of absence in the

record.  *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) ("[A] treating physician's opinion is

afforded less deference when the medical evidence in the record as a whole contradicts the

opinion.") (citation and marks omitted); (Admin. R. at 25).

### B.       Substantial Evidence

The ALJ considered the record evidence, all of Perry's symptoms that were consistent

with the objective medical evidence, the opinions of the consultative examiners, the opinions of

the State Agency consultants, Dr. Osekowsky's opinions, and Vonbargen's third party statement

in making his decision.  (Admin. R. at 25–26).  The ALJ adopted the opinions of Drs. Wiger and

Jankus and the State Agency Consultants.  (*Id.*).  Thus, substantial evidence in the record

supports the ALJ's RFC determination.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th

Cir. 2002); *Peka v. Colvin*, No. 12-CV-1593 (MJD/FLN), 2013 WL 4436180, at *12–13 (D.

Minn. Aug. 16, 2013).

## IV.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.       Perry's Motion for Summary Judgment [Doc. No. 8] be **DENIED**;

2.      The Commissioner's Motion for Summary Judgment [Doc. No. 11] be

**GRANTED**; and

3.      Judgment be entered and the case be dismissed.


Dated: March 27, 2014

*s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of court, and serving all parties by **April 10, 2014**, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.